UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JORA KIRAKOSIAN,                    )    Case No. CV 06-4776-JTL
                                    )
            Plaintiff,              )
                                    )    MEMORANDUM OPINION AND ORDER
        v.                          )
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social              )
Security,                           )
                                    )
            Defendant.              )
_____)

**PROCEEDINGS**

On September 14, 2006, Jora Kirakosian ("plaintiff") filed a Complaint seeking review of the Commissioner's denial of his application for social security disability benefits. On October 30, 2006, defendant and plaintiff, respectively, filed a Consent to Proceed Before United States Magistrate Judge Jennifer T. Lum. Thereafter, on March 14, 2007, defendant filed an Answer to Complaint. On May 16, 2007, the parties filed their Joint Stipulation.

The matter is now ready for decision.

**BACKGROUND**

On February 25, 2003, plaintiff filed an application for social security disability insurance benefits. (Administrative Record ["AR"] at 54). Plaintiff alleged that, beginning on May 20, 1987, depression, anxiety, difficulty in concentration, and lack of energy prevented him from working.[1] (AR at 101). In a November 7, 2003 letter, the Commissioner denied plaintiff's application for benefits. (AR at 63-66). Plaintiff then filed a request for reconsideration, which the Commissioner subsequently denied. (AR at 59-61). On June 8, 2004, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR at 49).

On April 13, 2005, the ALJ conducted a hearing in West Los Angeles, California. (AR at 295-307). Plaintiff appeared at the hearing with his counsel and, assisted by an interpreter, testified. (AR at 297-302, 305). A vocational expert also testified at the hearing. (AR at 304).

On September 13, 2005, the ALJ issued his decision denying benefits. (AR at 22-31). In his decision, the ALJ concluded that plaintiff suffered from severe lumbosacral and cervical spine conditions and mental impairments. (AR at 26). According to the ALJ,

---

[1] On January 28, 1999, plaintiff filed an application for social security disability insurance benefits. An ALJ issued a decision in February 2002, denying plaintiff's application. The Appeals Council vacated and remanded the matter to the ALJ. The Request for Hearing was dismissed because of an unexcused failure to appear by plaintiff. The effect of the dismissal was to render the August 27, 1999 administrative denial of the January 1999 application the final determination of the Commissioner. Since the time period for reopening the case has lapsed, the only issue here is whether the claimant has been disabled since February 25, 2003, the protective filing date of the pending application. (AR at 25-26).

however, none of these impairments, either individually or in combination, met or equaled any of the criteria contained in the Commissioner's Listing of Impairments, 20 C.F.R. Section 404, Subpart P, Appendix 1. (AR at 31). The ALJ also determined that plaintiff maintained the residual functional capacity ("RFC") to perform a full range, or essentially a full range of unskilled medium work. (AR at 31). Ultimately, the ALJ found that plaintiff was not disabled pursuant to the Social Security Act. (AR at 31).

On September 28, 2005, plaintiff filed a timely request with the Appeals Council for review of the ALJ's decision. (AR at 16-18). On July 7, 2006, the Appeals Council affirmed the ALJ's decision. (AR at 4-6).

## PLAINTIFF'S CONTENTIONS

Plaintiff makes the following contentions in the Joint Stipulation:

1. The ALJ improperly rejected the opinions of plaintiff's treating physicians.

2. The ALJ erred in relying on the "Grids of the Medical Vocational Guidelines."

3. The ALJ erred in determining that plaintiff retains the RFC to perform medium work or work at any level of exertion on a sustained basis.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and whether the proper legal standards were applied. DeLorme

1  v. Sullivan, 924 F.2d 841, 846 (9th Cir. 1991).  Substantial evidence

2  means "more than a mere scintilla" but less than a preponderance.

3  Richardson v. Perales, 402 U.S. 389, 401 (1971); Desrosiers v. Sec'y

4  of Health & Human Servs., 846 F.2d 573, 575-76 (9th Cir. 1988).

5       Substantial evidence is "such relevant evidence as a reasonable

6  mind might accept as adequate to support a conclusion." Richardson,

7  402 U.S. at 401.  This Court must review the record as a whole and

8  consider adverse as well as supporting evidence.  Green v. Heckler,

9  803 F.2d 528, 529-30 (9th Cir. 1986).  Where evidence is susceptible

10  of more than one rational interpretation, the ALJ's decision must be

11  upheld.  Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984).

12

13                              **DISCUSSION**

14  **A.   The Sequential Evaluation**

15       The Commissioner has established a five-step sequential process

16  for determining whether a claimant is disabled.  20 C.F.R. §§

17  404.1520, 416.920 (1991); Bowen v. Yuckert, 482 U.S. 137, 140-42

18  (1987).  At step one, disability benefits are denied if the

19  Commissioner determines that the claimant is engaged in substantial

20  gainful activity.  Id. at 140.  At step two, the Commissioner

21  evaluates whether the claimant has a medically severe impairment which

22  significantly limits his physical or mental ability to do basic work

23  activities.  Id. at 140-41.  Step three requires a consideration of

24  whether the claimant's impairment is equivalent to one of a number of

25  listed impairments that are so severe as to preclude substantial

26  gainful activity.  Id. at 141.  If the claimant's impairment meets or

27  equals one of the listed impairments, the claimant is presumptively

28  disabled.  Bowen, 482 U.S. at 141.  If the impairment is not one that

1  is conclusively presumed to be disabling, step four of the evaluation

2  determines  whether  the  impairment  prevents  the  claimant  from

3  performing work he has performed in the past.  Id.  If the claimant

4  cannot perform the past work, the fifth and final step determines

5  whether he is able to perform other work in the national economy in

6  light of his age, education and work experience.  Id. at 142.  The

7  claimant is entitled to disability benefits only if he is not able to

8  perform such work.  Id.

9  **B.  The ALJ's Decision to Reject the Treating Physicians' Opinions**

10      Plaintiff contends that the ALJ improperly rejected the opinions

11 of plaintiff's treating physicians, Wayne A. Taubenfeld, Ph.D., and

12 Levon Antossyan, M.D.  These errors, according to plaintiff, require

13 the Court to reverse the ALJ's decision, or in the alternative, remand

14 the case to enable the ALJ to give proper consideration to the

15 opinions of plaintiff's treating physicians or legitimate reasons for

16 rejecting them.

17      An ALJ should give a treating physician's opinion greater weight

18 than that of an examining physician.  See Andrews v. Shalala, 53 F.3d

19 1035, 1040-41 (9th Cir. 1995) ("It is clear that more weight is given

20 to a treating physician's opinion than to the opinion of a non-

21 treating physician because a treating physician 'is employed to cure

22 and has a greater opportunity to know and observe the patient as an

23 individual.'") (quoting Magallenes v. Bowen, 881 F.2d 747, 751 (9th

24 Cir. 1989); see also Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir.

25 1987).  "The treating physician's opinion is not, however, necessarily

26 conclusive as to either a physical condition or the ultimate issue of

27 disability." Andrews, 53 F.3d at 1041.  The proper weight that an ALJ

28 should give to a treating physician's opinion depends on whether

1   sufficient data supports the opinion and whether the opinion comports
2   with other evidence in the record.  See 20 C.F.R. §§ 404.1527, 416.
3   927.

4        An ALJ may disregard a treating physician's opinion even where no
5   other medical evidence contradicts the opinion.  See Andrews, 53 F.3d
6   at 1041.   Before rejecting a treating physician's uncontroverted
7   opinion, however, the ALJ must present clear and convincing reasons
8   for doing so.  See id.; see also Montijo v. Sec'y of Health & Human
9   Servs., 729 F.2d 599, 601 (9th Cir. 1984).  "Even if the treating
10  doctor's opinion is contradicted by another doctor, the Commissioner
11  may not reject this opinion without providing 'specific and legitimate
12  reasons' supported by substantial evidence in the record for so
13  doing."  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); see also
14  Saelee v. Chater, 94 F.3d 520 (9th Cir. 1996).  Furthermore, "where
15  the opinion of the claimant's treating physician is contradicted, and
16  the opinion of a nontreating source is based on independent clinical
17  findings that differ from those of the treating physician, the opinion
18  may itself be substantial evidence; it is then solely the province of
19  the ALJ to resolve the conflict."  Andrews, 53 F.3d at 1041.

20       **1.   Wayne A. Taubenfeld, Ph.D.**

21       Dr. Taubenfeld treated plaintiff's various psychical disorders
22  between December 2003 and April 2005.  (AR at 201-203, 218-223).  Dr.
23  Taubenfeld prepared a summary report of Psychological Evaluations
24  performed on November 2, 2003 and November 12, 2003.  (AR at 177-183).
25  Dr. Taubenfeld recounted plaintiff's current complaints and various
26  histories.  (See, e.g., AR at 177-178).  Dr. Taubenfeld diagnosed
27  plaintiff with major depression, recurrent, severe, with psychosis,
28  vascular dementia, and generalized anxiety disorder.  (AR at 182).

Dr. Taubenfeld assessed plaintiff with a current Global Assessment of Functioning ("GAF") score of 49[2] with a severe impairment in emotional, social, and intellectual functioning. (Id.). Dr. Taubenfeld found plaintiff to be markedly impaired in his ability (1) to understand, carry out, and remember simple one or two step job instructions; and (2) to associate with day-to-day work activity, including attendance and safety. (AR at 183). Dr. Taubenfeld also found plaintiff to be severely impaired in his ability (1) to complete detailed and complex instructions; (2) to relate and interact with supervisors, coworkers and the public; (3) to maintain concentration and attention, persistence and pace; (4) to adapt to the stresses common to a normal work environment, including attendance and safety; and (5) to maintain regular attendance in the workplace and perform work activities on a consistent basis. (Id.).

In an October 13, 2004 report, Dr. Taubenfeld diagnosed plaintiff with major severe depression with psychosis, posttraumatic stress disorder, vascular dementia, and panic disorder. (AR at 281). Dr. Taubenfeld assessed plaintiff with a GAF score of 44 with a severe impairment in social, emotional, and cognitive functioning. (AR at 281).

---

[2] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." Vargas v. Lambert, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998).
    A GAF score between 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders 34 (4th. ed, rev. 2000).

1      These opinions conflict with medical evidence in the record.  For

2  example, Norma Aguilar, M.D., a consultative examining physician,

3  assessed plaintiff with a current GAF score of 62.[3]  (AR at 156).  Dr.

4  Aguilar determined that plaintiff's mental condition would only mildly

5  impact plaintiff's ability to work.  (AR at 157).  Specifically, Dr.

6  Aguilar stated:

7          This claimant has the ability to follow and

8          understand simple and complex instructions.  He

9          will be able to interact with supervisors, co-

10        workers and the public.  He will be able to

11        comply with job rules such as safety and

12        attendance but will have mild difficulty

13        responding to changes in the normal workplace

14        setting.  He likewise will have mild difficulty

15        maintaining persistence and pace in a normal

16        workplace setting.

17  (Id.).  Furthermore, Melanie Moran, Ph.D., a consultative examiner,

18  determined that plaintiff had the ability to follow directions, and

19  did not have difficulty remembering one- and two- part instructions.

20  (AR at 240).  Dr. Moran opined that plaintiff was capable of learning

21  simple repetitive skills, but that plaintiff may function best in a

22  non-interactive setting.  (AR at 240).

23

24

_____

25    [3] A GAF score of 61-70 indicates "[s]ome mild symptoms
(e.g., depressed mood and mild insomnia) or some difficulty in
26  social, occupational, or school functioning (e.g., occasional
truancy, or theft within the household), but generally
27  functioning pretty well, has some meaningful interpersonal
relationships." Diagnostic and Statistical Manual of Mental
28  Disorders 34 (4th. ed, rev. 2000).

1    Because Dr. Aguilar's and Dr. Moran's opinions contradicted Dr.
2    Taubenfeld's opinion, the ALJ had to give specific and legitimate
3    reasons for disregarding the latter's opinion. Lester, 81 F.3d at 830
4    (supra).   An ALJ can satisfy this burden "by setting out a detailed
5    and thorough summary of the facts and conflicting clinical evidence,
6    stating his interpretation thereof, and making findings." Magallanes,
7    881 F.2d at 751 (internal quotations and citations omitted)); Thomas
8    v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (same); Morgan v.
9    Comm'r of Social Sec. Admin., 169 F.3d 595, 600-01 (9th Cir. 1999).

10    In her decision, the ALJ accurately set forth the medical
11   evidence that contradicted Dr. Taubenfeld's opinion. (AR at 29-30).
12   In rejecting Dr. Taubenfeld's findings, the ALJ stated:

13            In generally assessing the severity of the
14            claimant's depression under regulatory criteria,
15            the ALJ finds moderate limitations in daily
16            activities, mild limitations in social
17            functioning and in concentration, persistence and
18            pace and no episodes of decompensation. The ALJ
19            finds it clear from the consultative examiners
20            that the claimant does not have psychotic thought
21            processes or content.... Dr. Aguilar assessed
22            that the claimant could perform complex tasks.
23            Dr. Moran's report suggests that this might not
24            be the case.   In any event, the claimant can
25            clearly do work of at least a simple and
26            repetitive nature.... The ALJ does not find a
27            medical reason for restricting the claimant's
28            social contacts in a work setting.

(AR at 30).

The ALJ acted well within her discretion by accepting the opinions of Dr. Aguilar and Dr. Moran over that of Dr. Taubenfeld.  An ALJ may reject a treating physician's opinion that conflicts with an examining physician's opinion if the examining physician bases her opinion on independent clinical findings.  Andrews, 53 F.3d at 1041 ("[W]here the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict.").  Here, Dr. Aguilar and Dr. Moran based their opinions on independent clinical findings and tests.  (AR at 157, 233).  Although Dr. Aguilar's and Dr. Moran's ultimate conclusions conflicted with the opinion of plaintiff's treating physician, Dr. Taubenfeld, the ALJ had the sole discretion to resolve this conflict.  In resolving the conflict in favor of Dr. Aguilar and Dr. Moran, the ALJ committed no error.  See Andrews, 53 F.3d at 1041 (supra).

Other evidence in the record also undermines the value of Dr. Taubenfeld's opinion.  Dr. Taubenfeld relied on psychological tests such as the Beck Depression and Anxiety Inventories and the Wechsler Memory Scale, which are graded based on the subjective responses of plaintiff that are within the full control of plaintiff.  The validity of these psychological tests was questionable.  For example, in reciting plaintiff's history, Dr. Taubenfeld reported that plaintiff stated that he was treated for anxiety when he lived in Armenia and was given anti-anxiety medications.  (AR at 178).  On the other hand, when Dr. Aguilar interviewed plaintiff three months earlier, plaintiff

denied any psychiatric treatment in Armenia. (AR at 154). Plaintiff also said that he started feeling depressed and hearing voices after his son died. (AR at 177, 154, 235). Yet plaintiff offered several different versions regarding when his condition began. For instance, Dr. Taubenfeld reported that plaintiff's son died in 1980. (AR at 177). On the other hand, Dr. Aguilar stated that plaintiff began feeling depressed in 1997 or 1998 while he was still in Armenia. (AR at 154). Yet other evidence shows that plaintiff was already in the United States at that time. (AR at 154, 178, 235). In August 2003, plaintiff claimed to Dr. Aguilar that he had attempted suicide a month prior by cutting his veins and hitting his head against the wall. (AR at 155). Plaintiff, however, was not hospitalized, and plaintiff never reported this alleged suicide to Dr. Taubenfeld. (See AR at 177-83).

In an August 2, 2003 report, Dr. Aguilar described plaintiff as partly cooperative. (AR at 155). In a May 4, 2005 report, Dr. Moran noted problems both in plaintiff's presentation and in his efforts with respect to testing. (AR at 233-34, 240 ). Dr. Moran stated that the information she received was "only partially reliable due to the claimant's lack of seeming effort or concern for the evaluation." (AR at 233-34). Based on the foregoing, the ALJ found that Dr. Taubenfeld relied too heavily on information gleaned solely from subjective presentations and efforts by plaintiff that were not objectively verified. (AR at 28). The Court finds that substantial evidence supported the ALJ's decision to reject Dr. Taubenfeld's opinion.

**2.  Levon Antossyan, M.D.**

Dr. Antossyan treated plaintiff for his physical ailments from December 4, 2003 to April 14, 2005. (AR at 189-193, 208-217). Dr.

Antossyan diagnosed plaintiff with lumbosacral spine spondylosis and neuropathy, hypertension, hyperlipidemia and osteoarthritis. (AR at 189, 208). Dr. Antossyan's treatment notes indicate that plaintiff suffered from neck pain, back pain, lumbar spine spondylosis, osteoarthritis, cervical pain, numbness of the right hand, chest pain, shortness of breath, weakness, dizziness, insomnia, and depression. (AR at 245-275). Dr. Antossyan's progress notes indicate tenderness, decreased range of back and neck motion, and appearance of distress as present without quantification. (AR at 211-217). Dr. Antossyan stated that plaintiff's range of motion is restricted to 60% of normal. (AR at 189, 208). In a September 27, 2004 report, Dr. Antossyan opined that plaintiff could sit, stand, and walk up to twenty minutes at a time for a total of two hours out of an eight-hour workday for each activity; lift and carry only up to five pounds occasionally; bend occasionally and never squat, climb or reach; never engage in repetitive pushing and pulling of arm or feet controls or use hands for repetitive fine manipulation; and never travel by bus or subway. (AR at 190-92). In his April 14, 2005 report, Dr. Antossyan opined that plaintiff could sit, stand, and walk up to twenty-five minutes at a time for a total of two hours out of an eight-hour workday for each activity. (AR at 208). Ultimately, Dr. Antossyan concluded that plaintiff could not work. (AR at 210).

This opinion conflicted with medical evidence in the record. Anh-Tat-Hoang, M.D., a consultative orthopedic examiner, and Mark Borigini, M.D., a consultative examiner, determined that plaintiff had fewer restrictions than those assessed by Dr. Antossyan. (See AR at 160-66, 224-32, 189-93, 208-17). In an October 16, 2003 report, Dr. Hoang reported full range of motion of plaintiff's spine lumbosacral,

cervical spine, shoulders, elbows, and wrists.  (AR at 161-62).  Dr. Hoang also observed that plaintiff was in no acute distress, ambulating without an antalgic gait or discernible limp, sitting comfortably, getting on and off the examining table, squatting and rising, and doing heel/toe walking without difficulty.  (AR at 161). Ultimately, Dr. Hoang opined that plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently using the left major upper extremity, and that plaintiff was able to stand and/or walk with normal breaks for a total of six hours in an eight-hour workday.  (AR at 164).

Dr. Borigini also found plaintiff in "no distress" and had full range of motion of the lumbosacral and cervical spines and the upper and lower extremities, normal gait and station, normal neurological findings associated with back pain, and fine and gross manipulation with his hands.  (AR at 224-228).  In his report, Dr. Borigini restricted plaintiff from bending and crouching occasionally, but in an appended statement, Dr. Borigini indicated that all postural maneuvers – climbing, balancing, kneeling, crouching, crawling, and stopping – could be done frequently by plaintiff.  (AR at 228, 230). Ultimately, Dr. Borigini opined that plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently; and stand, walk, and sit for a total of six hours in an eight-hour workday.  (AR at 228-30).

Because the opinions of Dr. Hoang and Dr. Borigini contradicted that of Dr. Antossyan, the ALJ was required to give specific and legitimate reasons for disregarding Dr. Antossyan's opinion.  Lester, 81 F.3d at 830 (supra).  As noted above, an ALJ can satisfy this burden "by setting out a detailed and thorough summary of the facts

and conflicting clinical evidence, stating his interpretation thereof, and making findings." Magallanes, 881 F.2d at 751; Thomas, 278 F.3d at 957; Morgan, 169 F.3d at 600-01.

In her decision, the ALJ accurately cited and summarized the medical evidence contradicting Dr. Antossyan's opinion before rejecting Dr. Antossyan's ultimate disability conclusion. (AR at 27-28). After summarizing these conflicting findings, as well as Dr. Antossyan's findings, the ALJ rejected Dr. Antossyan's conclusions and resolved this conflict in favor of Dr. Hoang and Dr. Borigini:

> Given the claimant's normal neurological and physical findings and the other information discussed, the ALJ finds that the claimant can stand and/or walk without assistance for 6 of 8 hours with normal work breaks (and sit similarly). The 50/25 weight restrictions reflect the reliable assessments of the consultative physicians, who appear to relate this to the minor orthopedic involvement.

(AR at 28).

The ALJ acted within her discretion in accepting Dr. Hoang's and Dr. Borigini's conclusions over those of Dr. Antossyan. An ALJ may reject a treating physician's opinion that conflicts with an examining physician's opinion if the examining physician bases his opinion on independent clinical findings. Andrews, 53 F.3d at 1041. Here, Dr. Hoang and Dr. Borigini based their opinions on independent clinical findings and tests. (AR at 160-164, 224-232). Although their ultimate conclusions regarding plaintiff's ability to work conflicted with that of plaintiff's treating physician, Dr. Antossyan, it was in

the sole discretion of the ALJ to resolve this conflict.  Thus, in resolving the conflict in favor of Dr. Hoang's and Dr. Borigini's conclusions, the ALJ committed no error.  See Andrews, 53 F.3d at 1041 (supra).

**C.   Reliance on the "Grids of the Medical Vocational Guidelines"**

The ALJ used the Commissioner's Medical-Vocational Guidelines ("grids") 20 C.F.R., pt. 404, subpt. P, app. 2. to determine whether plaintiff retained the RFC to perform work that existed in the national and local economies.  (AR 30-31).  Plaintiff contends that the ALJ erred in relying on the grids because plaintiff suffered from non-exertional impairments and, according to plaintiff, Dr. Moran's opinion that plaintiff had borderline intellectual functioning precluded the ALJ from relying on the grids at Step Five of the sequential evaluation.  Plaintiff argues that the ALJ should have asked hypothetical questions to a vocational expert to determine plaintiff's ability to perform work in the national economy in light of his age, education, and work experience, and the ALJ's failure to consult a vocational expert requires the Court to award benefits to plaintiff or remand the case in order to make a proper disability determination.  The Court disagrees.

The ALJ found that plaintiff did not have past relevant work. (AR at 31).  Accordingly, this case reached the fifth step of the sequential evaluation employed to determine disability.  See Bowen, 482 U.S. at 142.  At this step, the ALJ must show that plaintiff could perform other work that exists in the national economy.  See Heckler v. Campbell, 461 U.S. 458, 467-68 (1983) ("[I]n determining whether a claimant can perform less strenuous work, the Secretary must make two determinations.  She must assess each claimant's individual abilities

and then determine whether jobs exist that a person having the claimant's qualifications could perform."); see also Bowen, 482 U.S. at 146 n.6 ("It is true . . . that the Secretary bears the burden of proof at step five, which determines whether the claimant is able to perform work available in the national economy.").

An ALJ may apply the grids to determine a claimant's residual functional capacity. See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985) ("[I]n determining whether a claimant can do substantial gainful work, the ALJ may apply the Secretary's medical-vocational guidelines. . . ."). But "if the grids fail to describe accurately a claimant's particular limitations, the [ALJ] may not rely upon the grids alone to show availability of jobs for the claimant." Gonzalez v. Sec'y of Health & Human Servs., 784 F.2d 1417, 1419 (9th Cir. 1986) (citations and quotations omitted) (emphasis in original); see also Jones, 760 F.2d at 998 (an ALJ should rely on grids "only when the grids accurately and completely describe the claimant's abilities and limitations.").

Generally, an ALJ should obtain a vocational expert's opinion where the plaintiff either suffers from only severe non-exertional impairments or suffers from a combination of severe exertional and non-exertional impairments. See Cooper v. Sullivan, 880 F.2d 1152, 1155 (9th Cir. 1989) ("[W]here a claimant suffers solely from a nonexertional impairment, the grids do not resolve the disability question; other testimony is required. In cases where the claimant suffers from both exertional and nonexertional impairments, the situation is more complicated."). Non-exertional (not strength related) limitations include mental, sensory, postural, manipulative, and environmental limitations. 20 C.F.R. pt. 404, subpt. P, app. 2 §

200.00(3); <u>Derosiers v. Sec'y of Health & Human Servs.</u>, 846 F.2d 573, 579 (9th Cir. 1988).  In contrast, an exertional impairment primarily limits the plaintiff's strength to sit, stand, walk, carry, lift, push, or pull.  <u>See</u> <u>Cooper</u>, 880 F.2d at 1156 (<u>citing</u> Soc. Sec. Ruling 83-10) ("The Secretary has defined 'exertional activity' as primarily involving the strength requirements of sitting, standing, walking, lifting, carrying, pushing, and pulling.  Thus, an exertional impairment is one that directly affects the claimant's strength.").

An ALJ, however, need not seek a vocational expert's opinion in every instance that a plaintiff alleges a non-exertional impairment. <u>See</u> <u>Desrosiers</u>, 846 F.2d at 577. Where the non-exertional impairment has only a minor impact on the plaintiff's ability to work, the ALJ commits no error in failing to consult a vocational expert. <u>See</u> <u>id.</u>, at 577 (<u>citing</u> <u>see, e.g.</u>, <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1304 (5th Cir. 1987) (an ALJ may rely exclusively on the Guidelines if the non-exertional impairments do not significantly affect claimant's RFC); <u>Bapp v. Bowen</u>, 802 F.2d 601, 605-06 (2d Cir. 1986) (an ALJ must consider whether the range of work claimant could perform was so significantly diminished as to require the testimony of a vocational expert); <u>Tucker v. Heckler</u>, 776 F.2d 793, 795-96 (8th Cir. 1985) (unnecessary to call vocational expert where ALJ thoroughly considered claimant's non-exertional impairments and explicitly determined that they did not diminish claimant's exertional capacities).

Borderline intellectual functioning, if supported by the record, is a significant non-exertional impairment, which requires an ALJ to consult a vocational expert. <u>Swope v. Barnhart</u>, 436 F.3d 1023, 1025 (8th Cir. 2006).

Here, plaintiff's claim fails because the record shows that plaintiff was functioning at an intellectual level in the borderline range, or higher. (AR at 240). For example, plaintiff underwent a Wechsler Adult Intelligence Scale-III test conducted by Dr. Moran on May 4, 2005, which revealed plaintiff had a verbal IQ of 64, performance IQ of 59, and full-scale IQ of 59. (AR at 238). Dr. Moran, however, specifically noted that these test scores were not considered valid due to plaintiff's poor effort. (AR at 240). Dr. Moran opined that plaintiff's intellectual level was at least in the borderline range, and noted that plaintiff appeared to have higher abilities than he demonstrated during the assessment. (Id.). None of plaintiff's other treating physicians conducted test that supported a finding of borderline intellectual functioning. In fact, Dr. Aguilar opined that plaintiff could follow and understand simple and complex instructions and similarly noted plaintiff's poor effort during the assessment of his intellectual functioning and sensorium. (AR at 155, 157).

Thus, a finding that plaintiff possessed borderline intellectual functioning was not supported by the record. Accordingly, the ALJ in this case was not required to consult a vocational expert and could properly rely on the grids to determine whether plaintiff retained the RFC to perform work that existed in the national and local economies. The ALJ properly concluded that while plaintiff's intellectual level was at least in the borderline range, plaintiff could still perform work of at least a simple and repetitive nature. (AR at 30). Accordingly, the ALJ found that the grids accurately classified plaintiff's abilities and limitations:

1                Given his poor efforts, his true intellectual

2                level is unknown, but is at least in the

3                borderline range.... In any event, the claimant

4                can clearly do work of at least a simple and

5                repetitive nature..... By Rule 203.18, Table no.

6                3, Appendix 2, to Subpart P of Regulations no. 4,

7                the Social Security Regulations take

8                administrative notice of approximately 2,500

9                separate sedentary, light and medium occupations,

10               each representing numerous jobs in the national

11               economy which do not require skills or previous

12               experience and which can be performed after a

13               short demonstration or within 30 days. As stated

14               it [sic] Appendix 2, these unskilled jobs

15               primarily involve the individual in dealing with

16               things (simple and repetitive tasks) rather than

17               in dealing with data or with other people. In

18               accord, these jobs do not require knowledge of

19               the English language. (e.g., see section

20               200.01(i)).

21 (AR at 30).

22    As discussed above, substantial evidence in the record supports

23 the ALJ's conclusion that the grids accurately described plaintiff's

24 abilities and limitations. The ALJ also accounted for the possibility

25 of plaintiff's borderline intellectual functioning in her disability

26

27

28

1  determination as well as other non-exertional impairments.[4]
2  Specifically, the ALJ precluded plaintiff from work requiring "complex
3  tasks."   (AR at 30).   No evidence in the record suggests that
4  plaintiff's non-exertional impairments restricted plaintiff's ability
5  to work beyond that which the ALJ determined.   As such, the ALJ
6  committed no reversible error in relying on the grids.   The Court,
7  therefore, rejects plaintiff's contentions to the contrary.

8  **D.    The ALJ Properly Determined Plaintiff's RFC to Perform Medium**
9      **Work on a Sustained Basis**

10      In addition to the claims discussed above, plaintiff makes a
11  general assertion that the ALJ erred in determining plaintiff's RFC.
12  This claim, however, is cumulative of the claims listed as Claims One
13  and Two in this Memorandum and Order.   (See supra).   For the reasons
14  stated above, the Court rejects plaintiff's claim that the ALJ erred
15  in determining plaintiff's RFC.

16  ///

17  ///

18  ///

19

20                              **ORDER**

21      After careful consideration of all documents filed in this
22  matter, this Court finds that the decision of the Commissioner is
23  supported by substantial evidence and the Commissioner applied the
24  proper legal standards.   The Court, therefore, AFFIRMS the decision of
25  the Commissioner of Social Security Administration.

26

27      [4] Other non-exertional impairments are discussed in Claim
28  One, and the ALJ properly concluded that they only impose mild
    limitations in a normal workplace setting.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: July 18, 2007

                                        _____/s/_____
                                        JENNIFER T. LUM
                                        UNITED STATES MAGISTRATE JUDGE